Filed 2/18/25  P. v. Lopez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B336229 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA204075) |
| v. | |
| LUIS LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, H. Clay Jacke, II, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Jonathan M. Krauss and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Luis Lopez appeals from an order summarily denying his petition for resentencing under Penal Code section 1170.95 (now section 1172.6).[1] The trial court found defendant was not entitled to relief as a matter of law because the jury was not instructed on felony murder or the natural and probable consequences doctrine. On appeal, defendant argues the court erred in denying his petition because the jury instructions permitted him to be convicted of murder under an imputed malice theory. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Charges and Conviction[2]

In June 2000, Mario Garcia (Garcia) was shot and killed at the intersection of East 49th Street and Ascot Avenue in Los Angeles. A Los Angeles Police Department detective observed a pool of blood on the sidewalk and found 37 spent bullet casings from semi-automatic weapons in the surrounding area.

Lourdes M., who lived on East 49th Street, heard gunshots and went out to her porch, where she saw someone wearing a white tee shirt and dark pants shooting. She saw the victim lying on the sidewalk and recognized him as Garcia, her niece's

---

[1] All subsequent statutory references are to the Penal Code. Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute. All further references to the statute will be to the new section number.

[2] Our summary of the facts is taken from the opinion of defendant's direct appeal following his conviction, *People v. Lopez* (Sept. 19, 2005, B175516 [nonpub. opn.].) We do not rely on the facts in resolving this appeal. The People's request for judicial notice of the entire appellate record of this prior appeal is denied.

boyfriend.  The shooter walked up to the body, touched it with his foot, and then got in a green-blue car that was parked nearby.  Lourdes saw a driver and a man in the back seat.  The car departed up Ascot Avenue towards East 48th Place.

Lourdes's nine-year-old son, Ricardo M., and his twelve-year-old cousin, Pedro G., were walking to a market on the corner of East 49th Street and Ascot Avenue on the day of the shooting.  Pedro saw Garcia running into an alley followed by a red car.  Pedro heard gunshots and saw the car stop.  A bald, dark-skinned male with a white shirt and black pants got out of the car's passenger side and ran towards Garcia.  Pedro heard more gunshots and saw Garcia emerge from the other end of the alley on Ascot Avenue.  A blue car pulled up, and a bald, dark-skinned man wearing a white shirt and black pants got out of the car, shot Garcia, and then kicked him as Garcia lay on the ground.  He shot Garcia again in the back.  Pedro saw defendant open the car door for the shooter, who got in, and the car went down Ascot Avenue.

Police went to a residence on East 48th Street shortly after the shooting, where they found defendant and Rogelio Medrano (Medrano) inside.  After police questioned Lourdes, Pedro, and Ricardo, they took them to the residence.  Lourdes identified Medrano as the shooter.  Pedro recognized defendant as the man sitting in the car.  Later, at the police station, Pedro said he only recognized Medrano and not defendant.

Ivonne G. and her sister Miriam, who lived on East 48th Street between Ascot Avenue and Compton Avenue, were awakened by gun shots.  Ivonne looked out the window and saw two to four Hispanic males, approximately 23 to 24 years old.  An aqua green car, driven by a man she knew as "George," drove by,

3

picked up the men, made a U-turn, and drove toward Ascot Avenue. Shortly after, Ivonne heard more gunshots. Ivonne saw the car return almost immediately. Two Hispanic males, whom she had seen standing in the street before being picked up by the car, got out and went into a house across the street. One of the men was carrying a gun. One was taller and heavier than the other. After stopping in front of the house, the man named George drove away.

Several months later, Ivonne saw a photographic lineup and identified defendant as the thinner man who got out of the car and Humberto Jorge Godoy as George. She said defendant was not the one who had the gun. At the time of the shooting, defendant was 5 feet 7 inches tall and weighed 135 pounds. Medrano was 5 feet 9 inches tall and weighed 220 pounds.

Defendant was placed in a six-person cell in the Los Angeles County Jail. One of defendant's cellmates testified at trial that defendant told him he had been arrested in a house after a shooting and that police had the gun. Defendant said he was charged with murder but did not say he was the murderer. The next day, the cellmate overheard defendant telling another cellmate about the crime, saying the police got the gun when they arrested defendant. The other cellmate asked about the gun and defendant gestured with his hands that he had cleaned it.

An information filed in October 2000 charged defendant and Medrano with one count of murder (§ 187, subd. (a)). It further alleged that a principal personally and intentionally discharged a firearm causing great bodily injury and death to Garcia (§ 12022.53, subds. (b), (c), (d), and (e)(1)); that Medrano personally and intentionally discharged a firearm causing great bodily injury and death to Garcia (§§ 12022.5, subd. (a), 12022.53,

4

subds. (b), (c), and (d)); and that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).[3]

Defendant and Medrano were tried together. The jury was instructed on murder and malice aforethought (CALJIC Nos. 8.10 and 8.11), first degree premeditated murder (CALJIC No. 8.20), second degree murder based on express malice (CALJIC No. 8.30), and aiding and abetting (CALJIC No. 3.01). The jury was not instructed on the felony murder or natural and probable consequences doctrine, or on second degree murder based on implied malice.

The jury convicted defendant of second degree murder. In a separate court trial, defendant admitted he had a prior serious felony conviction. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).) He was sentenced to a term of 30 years to life: 15 years to life for the murder conviction, doubled to 30 years for the previous strike. The judgment was affirmed on direct appeal.

### B.    Petition for Resentencing

In July 2023, defendant filed a petition for resentencing under section 1172.6. The trial court appointed counsel for defendant and ordered briefing. The court denied the petition, finding the jury was not instructed on felony murder, the natural and probable consequences doctrine, or any theory of imputed malice. Accordingly, the court found defendant was ineligible for resentencing as a matter of law.

---

[3]    After both sides rested at trial, the trial court granted defendant's motion to strike the gang allegation.

Defendant timely appealed.

## DISCUSSION

### A.    Governing Law and Standard of Review

The Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (SB 1437) to clarify the felony-murder rule and eliminate the natural and probable consequences doctrine "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); accord, § 189, subd. (e); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959.)  Under this framework, a "person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)  A person may still be convicted of murder as an aider and abettor.  (*People v. Coley* (2022) 77 Cal.App.5th 539, 546 (*Coley*) [theory of direct aiding and abetting remains a valid theory after SB 1437]; *People v. Reyes* (2023) 14 Cal.5th 981, 990–991 [aiding and abetting implied malice murder is a valid theory of second degree murder liability].)

SB 1437 also added now section 1172.6, providing a procedure for individuals convicted of murder under a now-invalid theory to seek retroactive relief by petitioning the sentencing court to vacate the conviction and resentence on any remaining counts.  (§ 1172.6, subd. (a).)  If a petitioner makes a prima facie showing for relief, the trial court is required to issue an order to show cause and hold an evidentiary hearing.  (*People v. Hurtado* (2023) 89 Cal.App.5th 887, 891; § 1172.6, subds. (c), (d)(1).)  However, if the petition and record in the case

6

establish conclusively that the petitioner is ineligible for relief as a matter of law, the court may deny the petition. (*People v. Strong* (2022) 13 Cal.5th 698, 708; *People v. Harden* (2022) 81 Cal.App.5th 45, 52 ["For example, if the record shows that the jury was not instructed on either the natural and probable consequences or felony-murder doctrines, then the petitioner is ineligible for relief as a matter of law"].)

We review de novo the trial court's denial of a section 1172.6 petition without issuing an order to show cause. (*Coley*, *supra*, 77 Cal.App.5th at p. 545; *People v. Harrison* (2021) 73 Cal.App.5th 429, 437.)

## B. The Jury Instructions Did Not Allow Malice to be Imputed to Defendant

Defendant does not dispute the jury in this case was not instructed on felony murder or the natural and probable consequences doctrine. Rather, relying on *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), he argues the jury instructions did not require finding he personally acted with malice and "instead permitted the jury to impute malice to him based on his aiding and abetting the perpetrator's unlawful act." We disagree.

In *Langi*, the appellant was convicted of second degree murder, battery, and robbery in connection with the beating death of a robbery victim. (*Langi*, *supra*, 73 Cal.App.5th at p. 975.) The victim died after someone in a group, which included the appellant, punched him, causing him to fall and hit his head. (*Ibid*.) "As the case was tried, the jury could have found [the appellant] guilty as an aider and abettor even if it found that someone else threw the fatal punch." (*Id*. at p. 980.) The appellant's jury was not instructed on the natural and probable

7

consequences doctrine, but he argued the instructions given were ambiguous and allowed the jury to find him guilty on a theory that imputed malice to him based solely on his participation in the crime. (*Ibid.*)

Two jury instructions were "of central significance": (1) CALJIC No. 8.31 on second degree murder and (2) CALJIC No. 3.01 on aiding and abetting. (*Langi*, *supra*, 73 Cal.App.5th at p. 981.) As given to the jury, CALJIC No. 8.31 stated that a killing was second degree murder if: "'1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.'" (*Ibid.*) CALJIC No. 3.01 stated "'A person aids and abets the commission . . . of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, . . . [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime.'"[4] (*Id.* at p. 981, fn. omitted.)

*Langi* found that although the aiding and abetting instruction stated that a person aids and abets a crime if he or she acts "with knowledge of the unlawful purpose of the perpetrator, and . . . with the intent or purpose of committing or encouraging or facilitating the commission of the crime," "the second-degree-murder instruction specified that the direct

---

[4]     CALJIC No. 3.01, as given in *Langi*, is identical in substance to the instruction as given to the jury in this case.

perpetrator of that crime need not act with the unlawful intent of causing death." (*Langi*, *supra*, 73 Cal.App.5th at p. 982, italics omitted.) "Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Id.* at pp. 982–983.) The instructions permitted the jury to conclude that, to be guilty as an aider and abettor of second degree murder, the appellant need only have intended to encourage the perpetrator's deliberate act (i.e., the punch), regardless of whether or not he "intended to aid or encourage [the] killing," or "knew of and disregarded the risk of such a killing." (*Id.* at p. 983.)

The aiding and abetting instruction created an ambiguity under which the jury could "find the [appellant] guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Langi*, *supra*, 73 Cal.App.5th at p. 982, fn. omitted.) Because the record of the appellant's conviction in *Langi* did not conclusively negate the possibility that the jury found him guilty as an aider and abettor on an imputed malice theory, an evidentiary hearing was required. (*Id.* at p. 984; but see *People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921, 936 [rejecting *Langi* because it failed to consider the requirement that a section 1172.6 petitioner show that the

petitioner "can no longer be convicted of murder 'because of changes' made" to the law of murder].)

We are not persuaded the ambiguity identified in *Langi* is present in this case. The only theories on which defendant's jury was instructed were first and second degree murder, either as a direct perpetrator or as an aider and abettor. Moreover, defendant's jury was instructed on only one theory of second degree murder: unpremeditated murder with the intent to kill (express malice murder) using CALJIC No. 8.30. CALJIC No. 8.30 instructed the jury: "Murder of the second degree is . . . the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation." Accordingly, the sole theory of second degree murder presented to the jury required it to find the perpetrator intended unlawfully to kill.

Reading CALJIC No. 3.01, the aiding and abetting instruction, together with the second degree express malice murder instruction, the jury could have found defendant aided and abetted second degree murder only if he acted with "knowledge of the unlawful purpose of the perpetrator"—that is, with knowledge of the perpetrator's unlawful intent "to kill a human being"—and that he acted "[w]ith the intent or purpose of committing or encouraging or facilitating the commission of the crime." Consequently, as instructed, the jury could not have found defendant guilty of second degree murder without finding he personally harbored malice. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1123 ["Absent some circumstance negating malice," where the only unlawful purpose charged is an unlawful killing,

"one cannot knowingly and intentionally help another commit an unlawful killing without acting with malice"].)

Defendant's reliance on *Langi* is misplaced. In *Langi*, CALJIC No. 8.31 specified that the perpetrator of the crime need not act with the unlawful intent of causing death, but in this case, CALJIC No. 8.31 was not given. (*Langi*, *supra*, 73 Cal.App.5th at p. 982.) The only theory of second degree murder on which defendant's jury was instructed required that the perpetrator acted with intent to kill and that defendant, as an aider and abettor, knew of and shared that intent. *Langi* is inapplicable where the record of conviction shows that the defendant "was convicted of second degree murder with express rather than implied malice." (See *Coley*, *supra*, 77 Cal.App.5th at pp. 547–548.)

Defendant argues the jury could have convicted him under a theory of second degree implied malice murder because the trial court gave the jury CALJIC No. 8.11, which generally defines malice aforethought as including both express and implied malice. However, nothing in CALJIC No. 8.11 negates the specific instructions the jury was given, requiring it to convict defendant of second degree murder if he knew "the perpetrator intended unlawfully to kill a human being" and acted with the intent to aid the perpetrator's crime.[5] (See CALJIC Nos. 3.01 and

---

[5]     *People v. Chun* (2009) 45 Cal.4th 1172, on which defendant relies in arguing that CALJIC No. 8.11 could have caused the jury to convict him of second degree implied malice murder, is distinguishable. In *Chun*, the trial court did not instruct the jury on second degree murder based on express malice (CALJIC No. 8.30). (*Id.* at p. 1202.) Thus, *Chun* did not hold that CALJIC No. 8.11 negates the requirement that a jury find the perpetrator intended unlawfully to

11

8.30.) We presume the jury understood and followed the trial court's instructions. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 940.)

Thus, to find defendant guilty of second degree murder, the jury was required to find defendant personally harbored malice. He is accordingly ineligible for relief under section 1172.6 as a matter of law.[6]

## DISPOSITION

The order is affirmed.


MORI, J.

We concur:


ZUKIN, Acting P. J.


COLLINS, J.

---

kill under CALJIC No. 8.30. Rather, *Chun* addressed an instructional error concerning the second degree felony murder rule. (*Id.* at pp. 1201–1203.)

[6] Given our conclusion, we do not reach the parties' remaining contentions, including the People's alternative argument that defendant's claim of instructional error should have been raised on direct appeal rather than a section 1172.6 petition, citing *People v. Berry-Vierwinden, supra*, 97 Cal.App.5th 921, *People v. Burns* (2023) 95 Cal.App.5th 862, and *People v. Flores* (2023) 96 Cal.App.5th 1164, 1174.)

12